Filed 12/16/21; Certified for Publication 1/13/22 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| OCEAN STREET EXTENSION NEIGHBORHOOD ASSOCIATION, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SANTA CRUZ et al., <br><br> Defendants and Appellants; <br><br> RICHARD MOE et al., <br><br> Real Parties in Interest and Appellants. | D079064 <br><br><br> (Super. Ct. No. 18CV03212) |

APPEAL from an order and judgment of the Superior Court of Santa Cruz County, Paul P. Burdick, Judge.  Affirmed in part; reversed in part.

Law Office of Babak Naficy and Babak Naficy for Plaintiff and Appellant.

Atchison, Barisone & Condotti, Anthony P. Condotti, and Barbara H. Choi for Defendants and Appellants.

Remy Moose Manley, Christopher L. Stiles, and Tiffany K. Wright for Real Parties in Interest and Appellants.

INTRODUCTION

In 2010, real parties in interest, Richard Moe, Ruth Moe, Craig Rowell, and Corinda Ray,[1] applied to the City of Santa Cruz for design and planned development permits and a tentative map to construct a 40-unit development with 10 four-unit buildings on a parcel of land located at 1930 Ocean Street Extension. Following an initial mitigated negative declaration and years of litigation surrounding the impact of the nearby crematory at Santa Cruz Memorial Park, in 2016, the real parties in interest renewed their interest in moving forward with their project. As required by the California Environmental Quality Act (CEQA) (Pub. Resources Code,[2] § 21000 et seq.), the project applicant and the City of Santa Cruz prepared and circulated the initial study, the draft environmental impact report (EIR), the partially recirculated draft EIR, and the final EIR. Following a public hearing, the city council adopted a resolution to certify the EIR and to adopt Alternative 3, a 32-unit housing project.

The Ocean Street Extension Neighborhood Association (OSENA) filed a petition for writ of mandamus, alleging the City of Santa Cruz and its city

---

[1]     The real parties in interest are the project applicants. Some documentation indicates all real parties in interest own the property; other documentation indicates the property is owned in a co-trust by Richard and Ruth Moe.

[2]     Further section references are to the Public Resources Code unless otherwise specified.

council violated CEQA and the Santa Cruz Municipal Code in approving the project.[3]

The court concluded the City had complied with CEQA, but it determined the City violated the municipal code, and it issued a limited writ prohibiting the City from allowing the project to proceed unless and until it followed the municipal code and the court was satisfied with its compliance.

Following entry of judgment, OSENA appealed, arguing the court erred by concluding the City complied with CEQA's requirements. OSENA contends the City violated CEQA by (1) insufficiently addressing potentially significant biological impacts and mitigation measures in the initial study rather than in the EIR directly, (2) establishing improperly narrow and unreasonable objectives so that alternative options could not be considered meaningfully, and (3) failing to address cumulative impacts adequately. The City cross-appealed, contending the court incorrectly concluded it violated the municipal code by granting a planned development permit (PDP) (Santa Cruz Mun. Code, § 24.08.700) without also requiring the project applicant to comply with the slope modifications regulations (*Id.*, § 24.08.800). We agree with the City, and we will affirm the portion of the order and judgment concluding it complied with CEQA and reverse the portion of the order and judgment concluding the City violated its municipal code.

BACKGROUND AND PROCEDURAL FACTS

In 2010, the project applicant submitted a PDP to the City. The project is located on a 2.74 acre, irregularly shaped lot on the east side of Ocean Street Extension, adjacent to the northern city limits. It has a frontage on Ocean Street Extension, and the property slopes up from Ocean Street

---

[3] The City of Santa Cruz, the city council, and the real parties in interest filed jointly. Accordingly, we refer to them collectively as the City.

3

Extension to Graham Hill Road. The portion of the site adjacent to Ocean Street has slopes of less than 15 percent, and the upper portion of the site has slopes greater than 15 percent, with the steepest slopes located along the eastern edge of the property line, where they are greater than 30 percent. On the north side of the property, there is an adjacent vacant parcel. On the south side is the Santa Cruz Memorial Crematory. The surrounding area includes a mix of residential uses, including multifamily apartments and condominiums along Graham Hill Road south of Ocean Street Extension and low-density, single-family homes along Graham Hill Road to the north.

The project proposal consisted of a 40-unit residential complex, with 10 buildings, each containing four units, located at 1930 Ocean Street Extension. There is a mix of one-bedroom/one-bath units and two-bedroom/two bath units, with living areas of 940 square feet and 1,091 square feet respectively. The first-floor units of two of the buildings contain two one-bedroom/one-bath handicapped-accessible units, for a total of four accessible units on the site. The project also includes three detached carports, three refuse areas, and a 375-square foot manager's office with a terrace and garden. The applicants intend to rent the units for the foreseeable future, but they may eventually opt to sell them.

The project required approval of a design permit, a PDP, and a condominium subdivision map, as well as amendments to the General Plan designating the parcel as LM (low medium density residential) and rezoning it to multiple residence-low density. The PDP sought two variations from conventional regulations: tandem parking and development within 10 feet of a 30 percent or greater slope.

The City prepared an initial study and a mitigated negative declaration, which it circulated for public review. Comments in response

4

raised concerns about the nearby crematory and potential health and environmental impacts resulting from its emissions. The City Planning Commission initially heard the request in October 2010 and continued the hearing to collect additional information related to concerns about the crematory. Eventually the crematory owner agreed to relocate the crematory, and the City approved that relocation in 2014. OSENA challenged the relocation of the crematory, and the Santa Cruz Memorial Park eventually agreed to remove dental amalgams from teeth of deceased individuals to resolve the concerns. Subsequent studies revealed the mercury levels on the project site were below established human health screening levels and posed no threat.

In September 2016, the project applicant decided to move forward with the project, and the City prepared an initial study. The City circulated the initial study and the notice of preparation for the EIR for a 30-day comment period. It also held a meeting to solicit comments on the scope of the EIR. The initial study identified two potentially significant biological impacts that would be reduced to less-than-significant impacts with required mitigation measures in place. Public comments included, among other things, questions about potential biological impacts, which the City subsequently addressed.

In May 2017, the City released a draft EIR (DEIR) for public comment. The DEIR included as an appendix the entirety of the initial study. It also included and discussed three project alternatives: a project with nine dwelling units; a project with 19 single family homes; and a 32-unit multi-family alternative, in addition to the "no project" alternative. At the request of commenters, the City revised and recirculated for a 45-day review period a partially recirculated DEIR that updated information about traffic and transportation.

In August 2018, the City released the final EIR (FEIR). The Planning Commission held a public hearing and recommended the city council approve the proposed 40-unit project. The City Council considered the EIR and the project proposal on September 25, 2018. The vice mayor moved to accept Alternative 3, reducing the project from 40 units to 32 units. A majority of council members voted to approve this alternative and certify the EIR. The City filed a Notice of Determination on September 26, 2018. OSENA filed a petition for writ of mandamus on October 25, 2018, alleging the City's certification of the EIR violated CEQA, and it failed to comply with the Santa Cruz Municipal Code.

On November 12, 2018, the City Council adopted Resolution No. NS-29,449, which amended the General Plan to change the land use designation of the project parcel to low medium density, rezoned the parcel to multiple residence-low density, and approved the design permit and PDP applications, as well as the tentative map.

The superior court heard arguments on November 22, 2019 and January 10, 2020. On April 22, 2020, the court entered judgment. It found the City fully complied with CEQA in preparing and certifying the EIR and denied the writ as to those claims. It granted a limited peremptory writ of mandamus remanding the proceedings to the City and directing the City to set aside the PDP granted by Resolution No. NS-29,449 and to take further action in compliance with the judgment. It granted injunctive relief prohibiting the City from proceeding with the project unless and until the City complied with the Santa Cruz Municipal Code regarding the slope regulations.

OSENA timely appealed the court's CEQA decision. The City timely appealed the court's decision regarding the municipal code.

6

DISCUSSION

I.

ADEQUACY OF EIR

A. Additional Facts

1. Initial Study

The October 3, 2016 initial study described the project as a 40-unit apartment/condominium development consisting of 10 residential buildings and three carports. Project access would be provided via a private street, and it would create 95 parking spaces, as well as offsite road improvements.

The environmental impacts table noted potentially significant issues with two air quality factors, three geology and soil factors, one greenhouse gas emissions factor, two hydrology and water quality factors, one land use and planning factor, two transportation/traffic factors, and one utilities factor. It also noted several factors as potentially significant unless mitigation were incorporated: two biological resources impacts, one noise factor, and one cumulative impact. The initial study determined that the proposed project may have a significant impact on the environment, so an EIR was required. It identified topics to be discussed in the EIR, none of which were factors identified as potentially significant unless mitigation were incorporated.

In the section explaining the environmental checklist responses, the initial study addressed biological resources. It identified plant communities and habitat type and shared that a biological assessment had been conducted in March 2007 and updated in 2016. It explained the onsite grasslands provided a potential habitat for the Ohlone tiger beetle, the American badger, and the western burrowing owl, none of which were observed during the site survey. The site survey also found no evidence of San Francisco dusky-footed

woodrat nests but noted the site had the potential to support the species, and it recognized that eucalyptus groves could provide wintering habitat for monarch butterflies but explained the location offered a low-quality habitat because of the limited number of trees and lack of adjacent water source. Site visits in December 2007 and January 2008 also found no evidence of the monarch butterflies.

The initial study concluded there was a less-than-significant impact to special status species or sensitive habitats but nonetheless recommended as a condition of approval a preconstruction survey for active woodrat nests and either removal of the nests or enactment of a protective exclusion zone.

The initial study also detailed the locations of three main wildlife corridors, noting the project site did not fall within any of them. It identified nesting raptors as having the potential to occur in the eucalyptus trees on the project site. The impact analysis explained the proposed tree removal of seven eucalyptus trees and two acacia trees during breeding season, generally March 1 through August 1, could cause mortality to nesting avian species if active nest sites were destroyed. It also explained prolonged construction activity could result in nest abandonment or failure, and it determined this was a potentially significant impact, which would be reduced to a less-than-significant level by following the proposed mitigation measure.

Mitigation measure Bio-1 would schedule tree removal between August 15 and February 15, outside breeding season. If that schedule were not practical, a qualified biologist would conduct a pre-construction survey within 15 days of tree removal, and removal would be delayed until the nests

8

were not in use. It also required a suitable buffer zone, typically 300 feet for raptors and 100 feet for other species, to allow for construction activities without disturbing active nests.[4]

The initial study identified local ordinances related to tree removal, which set mitigation requirements. The project would require the removal of 10 heritage trees, nine onsite and one offsite in connection with road improvements. These removals were considered not significant because of the project's plan to plant 90 additional trees, including 11 live oak trees, which exceeded ordinance requirements.

The initial study recognized that construction could inadvertently damage six onsite live oak trees due to grading and disturbance of the root zones unless the trees and root zones were adequately protected. This potential damage led the agency to identify the project as having a potentially significant impact on the environment that would be reduced to less than significant with mitigation measures implemented.

In addition to planting additional trees beyond the number required by ordinance, the initial study required mitigation measure Bio-2 to mitigate the potential damage to the retained trees. Bio-2 requires the adoption of measures outlined in the project arborist reports, which detail specific measures for each tree, including construction fencing, cabling tree trunks, prohibiting storage or dumping in the fenced area, protecting trees and root zones, and pruning. The mitigation measures also require retention of an arborist to inspect and monitor tree protection zones throughout the duration of the project to ensure compliance with the measures.

---

[4]     The Biotics Resources Group report specified that a buffer zone would be an area where no construction would occur until fledglings had left the nest and were able to forage on their own.

In November 2016, in response to the City's notice of preparation of an EIR, OSENA complained that the site surveys were inadequate to establish the presence or absence of some protected species and sought information about the project impact on several species: the white-rayed pentachaeta, the garter snake, the Zayante band-winged grasshopper, and the Mount Hermon June beetle. OSENA also sought information about the risks to wildlife in the area from paving, traffic, and lights. The comments recommended risk mitigation efforts, like protective fencing, reduced speed limits, restricted traffic, and restricted construction timelines "to ensure breeding, nesting and migration habits" were unimpaired.

The agency revised the initial study to respond to comments. The revision explained that the March 2007, October 2010, and September 2014 site surveys produced no evidence of the white-rayed pentachaeta and noted that the species was last reported in the county in 1955. It also explained that the site was not located in a sensitive habitat area, and the biological surveys did not identify sandhills habitats, where the Mount Hermon June beetle and the Zayante band-winged grasshoppers are found.

2. DEIR

In May 2017, the agency issued the DEIR, which included Section 2.5.2, entitled Summary of Impacts and Mitigation Measures, Significant Impacts. In the portion entitled "Impacts Evaluated in Initial Study (Appendix A)," the DEIR identified nesting birds and heritage tree damage as biological impacts. The DEIR briefly noted that tree removal during nesting season could lead to mortality to nesting avian species and detailed the recommended mitigation. It identified the retention of six onsite coast live oak trees that could be inadvertently damaged during construction and detailed the recommended

mitigation measures explained in the initial study. It also separately identified that riparian, wetland, and sensitive habitats were addressed in the Biological Resources section of the initial study, found at Appendix A.[5]

3. Partially Recirculated DEIR

In April 2018, the lead agency issued its Partially Recirculated DEIR that addressed traffic and transportation. The Biological Resources section from the May 2017 DEIR was unchanged.

4. FEIR

In August 2018, the City issued the FEIR. The section summarizing impacts and mitigation measures explained that "[t]he discussions in the Initial Study of impacts that are not being addressed in detail in the text of the DEIR are intended to satisfy the requirement of CEQA Guidelines section 15128 that an EIR 'shall contain a statement briefly indicating the reasons that various possible significant effects of a project were determined not to be significant and therefore were not discussed in detail in the EIR.' The Initial Study is included in Appendix A of the EIR. A summary of less-than-significant and no impacts identified in the Initial study is presented at the end of this section."

FEIR, section 2.5.2, Significant Impacts, includes a summary of the project impacts on nesting birds and heritage trees. The text is identical to what appeared in the DEIR. The FEIR also separately identifies special status species and the riparian, wetland, and sensitive habitats as impacts evaluated in the Biological Resources section of the initial study, which was attached as Appendix A to the DEIR.

_____

[5] Appendix A to the EIR contained the full text of the initial study, including the discussion of biological resources.

11

## B. CEQA Requirements

CEQA was adopted so that "all agencies of the state government which regulate activities . . . which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage. . . ." (§ 21000, subd. (g).) The agency evaluates whether the proposed activity is subject to CEQA because it could affect the quality of the environment. If it is subject to CEQA, the agency decides whether the project qualifies for an exemption from CEQA review. (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1185 (*Union*).) If a project does not fall within a CEQA exemption, the lead agency conducts an initial study to determine whether the project may have a significant impact on the environment. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380; CEQA Guidelines, §§ 15063, subd. (a), 15002, subd. (k)(2) [hereinafter "Guidelines"].) The purposes of the initial study are to provide information to the lead agency so it can determine whether to prepare an EIR or a negative declaration, to enable the lead agency to modify the project by mitigating adverse impacts to a less-than-significant level so it can prepare a mitigated negative declaration, and to assist in preparing and EIR if one is required, by focusing the EIR on significant effects, identifying the effects determined not to be significant, and explaining why potentially significant effects would not be significant. (Guidelines, § 15063, subd. (c)(1)-(3)(C).) If the initial study reveals "substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the

12

environment," the lead agency prepares an EIR. (Guidelines, § 15063, subd. (b)(1)(A); *Union*, at p. 1187; *Save Our Big Trees v. City of Santa Cruz* (2015) 241 Cal.App.4th 694, 704-705.)

The CEQA Guidelines include an Environmental Checklist for use with the initial study to help lead agencies assess whether there are potentially significant environmental impacts that necessitate completing an EIR. (Guidelines, Appendix G.) This form contains a table that lists each of the environmental factors and asks the lead agency to identify whether that factor will have a potentially significant impact on the environment, a less than significant impact with mitigation incorporated, a less than significant impact, or no impact. (*Ibid.*) It directs users: "If there are one or more 'Potentially Significant Impact' entries when the determination is made, an EIR is required." (*Ibid.*, Evaluation of Environmental Impacts, No. 3.)

Accordingly, if no aspect of the project causes a significant effect on the environment, the lead agency prepares a negative declaration. (Guidelines, § 15063, subd. (b)(2); *Union*, *supra*, 7 Cal.5th at pp. 1186-1187.) And if the initial study identifies potentially significant environmental effects that can all be fully mitigated by changes in the project, and the project applicant agrees to incorporate the changes into the project, the lead agency prepares a mitigated negative declaration. (Guidelines, § 15070, subd. (b); *Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 488-489.)

"An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended to 'demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.'

13

[Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights*).) The EIR "must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Id.* at p. 405.)

Among other topics, an EIR must discuss significant environmental effects and unavoidable significant environmental effects, either in separate sections or by identifying them in a table showing where these subjects are addressed. (Guidelines, § 15126, subds. (a) & (b).) The EIR focuses on significant environmental effects, by "[d]escrib[ing] any significant impacts, including those which can be mitigated but not reduced to a level of insignificance" in addition to "impacts that cannot be alleviated without imposing an alternative design," as well as "their implications and the reasons why the project is being proposed, notwithstanding their effect." (*Id.*, § 15126.2, subds. (a) & (c).) For significant adverse effects, the EIR must describe feasible measures to minimize significant adverse effects and discuss the basis for selecting a particular measure where several are available. (*Id.*, § 15126.4, subds. (a)(1)(A) & (B).) And for any possible significant effects of a project determined not to be significant and therefore not discussed in detail

14

in the EIR, the EIR must contain a statement indicating the reasons for the determination, which can be contained in the initial study and attached. (*Id.*, § 15128.)

### C. The EIR is Adequate.

OSENA contends the City failed to comply with CEQA because the EIR does not analyze impacts to biological resources "in the EIR itself," and because the "cursory reference to the Initial Study's discussion of biological impacts was inadequate to fulfill its informational mandate."

We review compliance with CEQA for a prejudicial abuse of discretion. (§ 21168.5; *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 511.) Prejudicial abuse of discretion exists " 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 (*Vineyard*).)

"[W]hen the issue is whether an EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating 'informed agency decisionmaking and informed public participation[,]' " such a claim is "not typically amendable to substantial evidence review." (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 513, 515 (*Sierra Club*).) Noncompliance with information disclosure provisions may constitute prejudicial abuse of discretion. (*Id.* at p. 515.)

The EIR must be prepared "with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151; *Sierra Club*,

15

*supra*, 6 Cal.5th at p. 514; *San Francisco Ecology Center v. City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594.) Thus, the legal standard that applies to whether an EIR meaningfully addresses an issue is the general standard for adequacy. (*King & Gardiner Farm, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 848 (*King*).) The question is "whether [the] EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating 'informed agency decisionmaking and informed public participation.' [Citation.]" (*Id.*, at p. 848; *Sierra Club*, at p. 510 [reviewing court must be satisfied there is sufficient detail to enable those who did not participate in preparation to understand and meaningfully consider issues raised by project].)

1. Location of Discussion

We begin by addressing the placement of the discussion of biological resources in the initial study rather than in the EIR itself. Citing Guidelines, section 15063, subdivision (c)(2), OSENA argues that the discussion of environmental impacts mitigated to less than significant can only occur in an initial study when no EIR is prepared. The City counters that Guidelines section 15128 allows a lead agency to place the information in an initial study when possible significant effects are determined to be less than significant with mitigation.

Public Resources Code section 21068 defines "significant effect on the environment" as "a substantial, or potentially substantial, adverse change in the environment." The Guidelines use this definition to explain that an EIR is required if there is substantial evidence in the record that the project may have a significant effect on the environment. (Guidelines, § 15064, subd. (f).) The Guidelines also explain that that effects dismissed "as clearly insignificant and unlikely to occur" need not be discussed further in the EIR.

16

(*Id.*, § 15143.)  But neither the statutes nor the Guidelines explicitly addresses how to characterize an impact in the EIR after the lead agency has determined it in the initial study to be less than significant with mitigation incorporated.

The checklist promulgated in the Guidelines asks the lead agency to characterize each factor as potentially significant, less than significant with mitigation incorporated, less than significant, or having no impact. (Guidelines, Appendix G.)  When any of the factors is identified on the checklist as potentially significant, the EIR is triggered, but if the factors are all determined to be less than significant with mitigation, no EIR is required; a negative mitigated declaration is acceptable.  (*Ibid.*; *Id.*, §§ 15063, subd. (b)(1)(A), 15070, subd. (b).)  This suggests that an environmental factor that is "less than significant with mitigation incorporated" is not considered "potentially significant" for purposes of triggering the EIR.  The EIR focuses on the environmental factors that have a significant impact.  (*Id.*, §§ 15063, subd. (c)(3), 15126, subd. (a) & (b).)

Here, the initial study did not use the information about the biological resources to decide whether to prepare an EIR or a negative declaration (Guidelines, § 15063, subd. (c)(1)) because other environmental factors necessitated the completion of an EIR.  (See *Id.*, § 15063, subd. (b)(1)(A); *Union*, *supra*, 7 Cal.5th at p. 1187 [if any aspect of the project may cause a significant effect on the environment, EIR is required].)  The information from the initial study enabled the lead agency to modify the project to mitigate adverse impacts before the EIR was prepared, helped focus the EIR on the effects determined to be significant, and explained the reasons potentially significant effects would not be significant, all purposes of an initial study identified in the Guidelines.  (See Guidelines, § 15063,

17

subds. (c)(2), (c)(3)(A) & (c)(3)(C).) Further, nothing prohibits the discussion of impacts that are less than significant with mitigation in an initial study rather than in the EIR so long as the EIR complies with its purpose as an informational document.

The purpose of CEQA is to ensure that a public agency regulates activities to prevent environmental damage (§ 21000, subd. (g)) and to alert the public and officials to environmental change so they can "consider meaningfully the [environmental] issues raised by the proposed project" (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 392, 405; § 21002). Thus, rather than elevate form over function here, we ask whether the information is adequate to facilitate " ' "informed agency decisionmaking and informed public participation." ' " (*King*, *supra*, 45 Cal.App.5th at p. 848.) As we next detail, the EIR, including its appendices, fulfills CEQA's purpose.

2. Sufficiency of the Information

There is no litmus test or minimum length required to ensure a discussion is sufficiently detailed to comply with CEQA's informational mandate. We do not look for technical perfection or " 'an exhaustive analysis,' " but instead we consider whether the information supplied is adequate, complete, and the agency has made a good faith effort at fully disclosing the information. (*Sierra Club*, *supra*, 6 Cal.5th at p. 515.)

The DEIR included a summary of impacts and mitigation measures and identified nesting birds and heritage tree damage as potential biological impacts. It explained that tree removal during nesting season would lead to avian mortality and detailed the recommended mitigation. It specifically identified the coast live oak trees that would be retained onsite, explained the potential for damage to those six trees, and outlined mitigation measures to

18

protect each of them.  And it directed readers to the initial study.  After the initial study was circulated for comment, the DEIR, which included a full copy of the initial study, was also circulated for public comment.

The FEIR explains that there are possible significant effects that were determined not to be significant with mitigation measures in place and directs readers to the appendix for more detail.  It summarizes the impacts the lead agency determined were less than significant, including the impacts on biological resources, and specifically potential impacts on nesting birds and heritage trees.  The FEIR also recognizes comments regarding biological resources and directly addressed the concerns regarding the Ohlone tiger beetle, the monarch butterfly, Mount Hermon June beetle, kangaroo rat, and endangered plants, steelhead and coho salmon, and the tidewater goby.

The FEIR directs the public and decisionmakers to information about the project's potential effects on biological resources in the section summarizing impacts and mitigation procedures, in section 2.5.2, and again in the section labeled Biological Resources.[6]

The initial study is available in its entirety and incorporated into the FEIR.  It describes the habitat and summarizes the findings from site surveys conducted in 2007, 2010, 2014, and 2016.  It explains the significance of tree removal to nesting birds' mortality and requires mitigation measures to avoid disrupting active nests.  It also recognizes the potential for activities to disturb the birds and incorporates mitigation measures to avoid those disruptions.  The initial study details the potential for inadvertent damage to live oak trees and adopts mitigation measures to address those possibilities.

---

[6]    This information was identical to what was included in the DEIR, so OSENA also had time to review and respond to it.

The information alerts officials and the public to the environmental issues and provides adequate information to inform them. (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 391, 405; *King*, *supra*, 45 Cal.App.5th at p. 848.)

To challenge the depth of the analysis, OSENA argues in its reply brief that the EIR should have addressed the types of birds that could be affected, the likelihood that they could be found at the site, and the likelihood and magnitude of the project's impact on them. While these details may have enhanced the discussion, their absence does not undermine the adequacy of the EIR as an informational document because the initial study makes clear that whatever the birds affected, their nests will not be removed when in use; thus, any impact to bird mortality has been eliminated.

Finally, OSENA argues that it was improper for the City to rely on mitigation measures identified in the initial study, suggesting *Salmon Protection & Watershed Network v. City of Marin* (2004) 125 Cal.App.4th 1098 holds that mitigation measures may only be discussed as part of the FEIR. In *Salmon* the lead agency employed an exemption to avoid any CEQA review and did not prepare an initial study, relying on mitigation measures to justify the exemption. (*Salmon*, at pp. 1104, 1107.) The court explained that if a project may have a significant effect on the environment, a CEQA review is required, at which time mitigation measures become relevant. (*Salmon*, at p. 1107.) But the court did not conclude that mitigation was only relevant to an EIR; it recognized that mitigation measures could be considered for a mitigated negative declaration, too (*ibid.*), and that determination is made before an EIR is developed (Guidelines, § 15070, subd. (b)). Further, in addition to being supplied in the initial study,

the mitigation measures are identified and detailed in the FEIR, in section 2.5.2 and in the Mitigation Monitoring and Reporting Program (MMRP) adopted by the City.

The EIR provides a sufficient degree of analysis so that decisionmakers could intelligently take account of environmental consequences. It appropriately focuses on significant environmental effects (Guidelines, §§ 15126, 15126.2, subds. (a) & (c)), describes feasible mitigation measures (*Id*., §§ 15126.4, subds. (a)(1)(A) & (B), 15123), and it explains why it determined the environmental effects on biological resources will be less than significant with the required mitigation measures.[7] (*Id*., § 15128). Thus, we conclude the FEIR is adequate; there is no prejudicial abuse of discretion.

3. Discussion of Mitigation Measures

OSENA also argues that the EIR is inadequate because the mitigation measures are vague, and their adoption impermissibly defers determination of the measures to a later date.

OSENA raises these challenges for the first time on appeal. Because OSENA failed to exhaust its administrative remedies, as it was required to

---

[7] OSENA contends that "credible information received by the City subsequent to the approval of the Initial Study contradicts the Initial Study's findings." This argument is not one of adequacy but instead appears to challenge the correctness of the agency's conclusions. We note that the documents OSENA references are letters requesting an additional survey for monarch butterflies, which ultimately occurred and found no presence of monarch butterflies; a recommendation for a preconstruction survey to verify the lack of woodrats, which was adopted as a condition of approval; and a letter explaining more recent surveys confirmed earlier findings. Further, while some of OSENA's comments challenged the findings of the site surveys, OSENA did not offer contradictory findings. And even if they had, we would find no error by the superior court because there is substantial evidence to support the City's conclusions. (See *Laurel Heights*, *supra*, 47 Cal.3d at pp. 392-393.)

do (see § 21177, subd. (a); *City of Long Beach v. City of Los Angeles* (2018) 19 Cal.App.5th 465, 474-475), we lack jurisdiction to consider this argument (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 615 [exhaustion of administrative remedies is jurisdictional]; *Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 [failure to exhaust administrative remedies precludes raising an issue on appeal]).

Even if we had jurisdiction, we would find OSENA forfeited this argument by failing to raise it in the superior court. (See *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 329 [appellant forfeited CEQA argument by raising it for the first time on appeal]; *Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 717-718 [same].)

Finally, even we were to consider the issue on the merits, we would conclude there was no prejudicial abuse of discretion because substantial evidence in the record supports the City's determination. The question of the effectiveness of the mitigation measures is a factual one. (See *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 637-638 (*North Coast Rivers*).) Where, as here, the challenge is to the City's conclusions, we ask whether substantial evidence supports the conclusions, not whether others might disagree with them. (*Id.* at pp. 626-627.)

OSENA directs us to *Lotus v. Department of Transportation* (2014) 223 Cal.App.4th 645 (*Lotus*) to compare the deficiencies there to the EIR here. In *Lotus*, the FEIR discussed overall impacts on the community of redwood trees but failed to identify trees that would be impacted or the significance of those impacts. (*Id.* at p. 654.) Because experts cited in the EIR concluded there

would be no significant impact on tree roots without first discussing the environmental impacts without mitigation measures, it was not possible to assess whether other possible mitigation measures would be more effective. (*Id.* at p. 657.) Further, this deficiency was pointed out in the comments to the DEIR by the Department of Parks and Recreation but not addressed in the FEIR. (*Id.* at pp. 657-658.) The failure to correct this deficiency was exacerbated by other inconsistencies in the DEIR that likewise were not corrected in the FEIR. For example, although the DEIR stated no mitigation measures were proposed, it also contained mitigation measures elsewhere in the draft. (*Ibid.*)

Further, the DEIR in *Lotus* identified mitigation measures to be taken at the contractors' discretion rather than as enforceable mitigation measures, even though the measures would be necessary to avoid a significant environmental impact to tree roots. (*Lotus*, *supra*, 223 Cal.App.4th at p. 657.) Although the lead agency responded to these concerns with an assurance that it would identify avoidance and mitigation measures in the final draft, it failed to do so. (*Id.* at pp. 657-658.) Ultimately, the appellate court concluded that the failure to separately identify and analyze the significance of the project's impacts to the redwood trees' root zones before proposing mitigation measures was a procedural failing showing a prejudicial abuse of discretion. (*Id.* at p. 658.)

But the mitigation measures here are not comparable to those in *Lotus*; they are neither vague nor deferred. Bio-1 requires tree removal between August 15 and February 15, outside breeding season, to avoid disrupting nesting birds. For construction that occurs during nesting season, Bio-1 establishes buffer zones of 100 to 300 yards based on the bird species so that activities do not disturb the nesting birds. To verify the need for buffer zones,

23

Bio-1 requires a qualified biologist to conduct a preconstruction survey to identify any active nests and employ the aforementioned measures. By prohibiting tree removal and establishing zones in which no construction can occur, this mitigation measure sets specific guidelines to ensure there is no disturbance of active nests, thereby eliminating potential for bird mortality. The requirement of a preconstruction survey does not make this mitigation measure a deferred one or one based solely on the discretion of the biologist because it specifies the actions taken based on the findings of the survey. (See *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1126-1127 [mitigation measure required lighting design that avoids adjacent properties]; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1277 [mitigation measure requires preconstruction surveys for toads and establishes requirement for satisfactory breeding pools if toads found].) Accordingly, it complies with CEQA. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 408 [EIR discussion of mitigation measures can be imperfect in particulars and also adequate].)

The mitigation measures in Bio-2 likewise are sufficiently detailed and certain, distinguishing them from those in *Lotus*. Unlike the measures in *Lotus*, Bio-2 is directed at identified trees, and the adopted arborist reports specify the treatment for each one of the trees. Bio-2 requires fencing, cabling tree trunks, prohibiting storage or dumping in the fenced area, pruning, and other root protection activities.[8] It requires an arborist to be retained throughout construction to ensure that each of the recommendations listed in the arborist report occurs. And additional conditions of approval

---

[8]     OSENA's comments asked the City to consider mitigation efforts such as protective fencing and construction timelines to ensure breeding, nesting and migration habits were protected.

separately mitigate tree loss because the City must plant 90 new trees, more than three times the amount required for the 11 oak trees that are identified for removal.  Even if these six trees are damaged, their damage is mitigated through planting additional trees in accordance with city ordinances.  Thus, not only is the information sufficiently detailed, but the conclusions are supported by substantial evidence.

II.

PROJECT OBJECTIVES

A.  Additional Facts

The EIR identified six project objectives, the first three of which reference the City's General Plan Housing Element Goals:

> "1. To develop a multi-family project that will provide 40 new work force housing opportunities to the City of Santa Cruz per the Housing Element, Goal 1.[9]

> "2. To provide 40 affordable-by-design, moderate cost housing opportunities per the Housing Element, Goal 2.[10]

> "3. To provide housing opportunities to persons with disabilities, per the Housing Element Goal 3.[11]

> "4. To make efficient use of an undeveloped parcel within existing city limits that is encircled by a greenbelt,

---

9      The City's General Plan Housing Element Goal 1 is to "[e]ncourage an adequate diversity in housing types and affordability levels to accommodate present and future needs of Santa Cruz residents."

10      Goal 2 is to "[i]ncrease and protect the supply of housing affordable to extreme low, very low, low, and moderate income households."

11      Goal 3 is to "[p]rovide for the development of accessible housing and appropriate supportive services that provide equal housing opportunities for special needs populations."

25

with new infill housing as a critical part of the City's approach to providing new housing opportunities.

"5. To provide new housing opportunities in a location that:

- Is close to Santa Cruz City core and services

- Can be accessed by public transportation, bicycle and pedestrians

- Is close to an arterial street (600 feet) and State highway transportation (1,650 feet)

"6. To develop 40 new housing opportunities in the free market:

- Without government or private subsidies

- While paying all application, impact and permit fees ($1,000,000+)

- While providing substantial off-site community improvements

- And creating jobs for local trades people and vendors via $10,000,000+ in construction costs"

An alternate use for the property was considered and eliminated because it was not consistent with the General Plan and did not meet the project objectives. The EIR also considered placing the project in an alternate location and eliminated that option because it was infeasible unless the applicant were to obtain ownership of an alternate property. This left four possible alternatives: no project; Alternative 1, a residential project under existing general plan and zoning designations (9 dwelling units); Alternative 2, a residential project with an existing General Plan amendment and rezoning the land to R-1-5 (19 dwelling units); and Alternative 3, a reduced-size project (32 dwelling units).

26

The agency did not recommend the no-project alternative because it did not meet any of the project's stated goals.

Alternative 1 considered developing nine single-family homes. Each home would be larger than 2,000 square feet, but the land use density would be substantially reduced from the original project. Homes this size are estimated to sell for between $1.7 million and $1.9 million. The project would meet objectives 3 and 5 but did not meet objectives 1, 2, 4, and 6.

Alternative 2 would develop 19 dwelling units on the property, which was nine more buildings than the project called for, and it would achieve objects 3, 4, and 5 and partially obtain objectives 1, 2, and 6. This alternative was consistent with the zoning as a low-density area.

Alternative 3 would develop 32 condominium/apartment units. It would reduce density, attain objectives 3, 5, and 6 and partially attain objectives 1, 2, and 6.[12]

The EIR contains a chart that compares the environmental impacts of the various alternatives. It explains that Alternatives 1 and 2 would potentially eliminate the significant impact related to nesting birds because it may not require tree removal, but it would not eliminate any of the other identified environmental impacts. Alternatives 2 and 3 partially attained objectives 1, 2, and 6 and attained objectives 3, 4, and 5. The EIR concludes that Alternative 3 would best achieve project objectives and reduce the severity of the impacts. Accordingly, the agency viewed Alternative 3 as the environmentally superior alternative of those reviewed.

---

[12] The EIR states that Alternative 3 would attain objectives 3, 5, and 6 and partially attain objectives 1, 2, and 6. This appears to be a typo because it ignores objective 4 and mentions objective 6 twice.

B. Project Objectives are Adequate.

OSENA argues the project's objectives are too narrow because they target 40 units, and also vague and misleading in their choice of descriptors. In particular, OSENA contends the terminology "work force housing opportunities," "affordable-by-design," and "moderate cost housing opportunities," merely function as advertising descriptors of the planned space. The City responds that the target number of 40 housing units reflects the desire to help meet the needs of the community in response to a housing crisis. The City also argues that the objectives did not preclude consideration of a reasonable range of alternatives.

CEQA requires an EIR to consider and analyze a range of reasonable project alternatives that would feasibly attain most of the basic objectives but would avoid or substantially lessen significant impacts of the project. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163 (*Bay-Delta*); Pub. Resources Code, § 21061; Guidelines, § 15126.6, subd. (a).) Clearly written objectives help the lead agency develop the range of alternatives by including the underlying purpose of the project. (*Bay-Delta*, at p. 1165; Guidelines, § 15124, subd. (b).) "Although a lead agency may not give a project's purpose an artificially narrow definition, a lead agency may structure its EIR alternative analysis around a reasonable definition of underlying purpose and need not study alternatives that cannot achieve that basic goal." (*Bay-Delta*, at p. 1166.)

As we previously indicated, under the prejudicial abuse of discretion standard, we review the challenge to the EIR to determine whether it adequately informs decisionmakers (*Sierra Club*, *supra*, 6 Cal.5th at p. 515; accord *Laurel Heights*, *supra*, 47 Cal.3d at p. 406; *King*, *supra*, 45 Cal.App.5th at p. 848), and we ask whether the agency's conclusions are

28

supported by substantial evidence (*Vineyard*, *supra*, 40 Cal.4th at p. 426; *North Coast Rivers*, *supra*, 216 Cal.App.4th at pp. 626-627).

Objective 1, which uses the term "work force housing opportunities" ties to Housing Element Goal 1, which seeks to encourage diversity in both types of housing and affordability levels, not tied to a particular definition of affordability. Objective 2, which uses the language "affordable-by-design, moderate cost housing opportunities," is tied to Housing Element Goal 2, which focuses on providing housing for "extreme low, very low, low, and moderate income households." While the EIR does not defined "affordable-by-design" or "moderate cost housing," the City's General Plan does explain what constitutes "affordable" housing: "Housing capable of being purchased or rented by a household with very low, low, or moderate income, based on a household's ability to make monthly payment necessary to obtain housing. Housing is considered affordable when a household pays less than 30 percent of its gross monthly income (GMI) for housing including utilities." The first two project objectives specify a goal of providing 40 housing units,[13] and they also incorporate the City's General Plan Housing Element Goals 1 and 2, which are to encourage diversity in housing types and affordability levels, including by increasing housing that is "affordable to extremely low, very low, low, and moderate income households." Thus, the underlying purpose of the project is to increase the volume of housing available to residents with a range of incomes.

Although OSENA challenges the objectives, it does not argue the City failed to consider a reasonable range of alternatives. Nor could it appropriately do so here because the City considered alternatives ranging in size from nine houses to 32 units. OSENA instead argues that the objectives

---

[13] The sixth objective also uses a target number of 40 housing units.

prevented serious consideration of smaller-sized projects and failed to foster informed decisionmaking. OSENA also implies Alternative 3 does not better meet the objectives than other alternatives.

1. Objectives Related to Affordability.

OSENA contends the project does not offer residential units that are affordable to "moderate income" families whose income does not exceed 120 percent of the area's median income and therefore does not achieve the first two objectives.

Alternative 3 partially attains the "affordable" housing goals because it requires the sale or rental of 15 percent of the units in compliance with the General Plan definition of "affordable housing." Alternative 3 also provides housing for residents with a range of incomes because it is multi-family housing, making it less expensive for working families-and thus more "affordable" as that word is used colloquially– than the proposals for 19 or nine single family homes, which would be more expensive.

OSENA argues the second objective is not bona fide because the project only requires affordable housing units consistent with the requirements in the City's inclusionary housing ordinance. This argument ignores the limited requirement of the City's inclusionary housing ordinance[14] and misstates the project's offerings. Because the underlying purpose of the project is to increase the volume of housing, and affordable housing in particular, the project's size impacts how well it achieves that underlying purpose. While all of the alternatives provide more affordable housing than currently exists, they do not all equally do so. Further, because Alternative 3 is a multi-family

---

[14]    At the time of the EIR, Santa Cruz Municipal Code, § 24.16.020(3)(d) required 15 percent of new housing units *sold* to be made available to lower and median income families at reduced prices.

option that provides rental opportunities, it exceeds the requirements of the ordinance, which do not require affordable rentals.  (See Santa Cruz Mun. Code, § 24.020(3)(a) (2018).)

2.  Increase Housing for People with Disabilities.

OSENA next challenges the EIR findings regarding the third objective, arguing that the project's goal of providing housing for people with disabilities is not met because the project does not include any services to meet the needs of individuals with special needs and only supplies the minimum number of handicapped-accessible units otherwise required by law. OSENA does not explain why housing must supply particular services to support people with disabilities to achieve this objective.  As the City notes, Alternative 3 includes ADA-accessible units, which provide housing opportunities for people with disabilities.

3.  Application Fees

OSENA contends objective 6 is invalid because all construction projects must pay application, impact, and permit fees.  It is unclear from the parties' briefs whether some projects benefit from fee reductions or government subsidies that may reduce the expenses a project would incur.  Regardless, because all the alternatives attain this goal, its inclusion or exclusion as an objective had no impact on the outcome here.

4.  Allegedly Conflicting Objectives

Finally, OSENA argues that objectives 1 and 2 conflict with objective 6 because the first two objectives relate to affordable housing options while the last one seeks to develop housing opportunities in the free market.  OSENA suggests a project cannot desire to increase more than one type of housing, i.e., provide affordable housing and also market rate housing simultaneously. However, these goals are not mutually exclusive; a project can provide

31

additional housing options of varying degrees of affordability, including units that are offered at market rate. And even where the underlying purpose of some of the objectives is to increase the availability of affordable housing, doing so does not preclude the development of other housing, particularly where, as here, the selected alternative includes multi-family units that may be more accessible to some economic segments of a community than larger, single-family homes, which under Alternative 1 would cost $1.7 to $1.9 million.

5. Substantial Evidence Supports City's Conclusion

OSENA ultimately disagrees with the City's analysis of the alternatives and its final conclusion. But whether to reject or approve any of the alternatives is a decision only for the decisionmakers. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 980-981.) They may reject alternatives that are undesirable from a policy standpoint (*id.* at p. 1001; *Los Angeles Conservancy v. City of West Hollywood* (2017) 18 Cal.App.5th 1031, 1041-1042; *City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 417 [feasibility includes a consideration of desirability based on "reasonable balancing of relevant economic, environmental, social, and technological factors"]) as well as alternatives that fail to meet project objectives (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 948-949 (*Rialto*)).

The EIR considered each of the alternatives and evaluated the degree to which each attained the project objectives and whether the alternatives would eliminate or reduce significant impacts. It compared each of the alternatives to the original proposal and the no-project option, and it recognized that all of the alternatives would reduce the significance of environmental impacts to varying degrees. As required, the EIR provided

32

information about each alternative that showed the major characteristics and significant environmental effects of each one. (See Guidelines, § 15126.6, subds. (a), (d); *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 547.) Thus, there was sufficient information for decisionmakers.

OSENA contends the City council was convinced not to select lower density alternatives because they failed to meet the project objectives. This would be an appropriate reason not to select an alternative. (*Rialto*, *supra*, 208 Cal.App.4th at pp. 948-949.) But none of the alternatives met all the objectives, and the EIR still selected Alternative 3 as the superior alternative because it best achieved the project's objectives of increasing housing availability while also reducing the severity of the significant impacts, conclusions supported by the analysis in the EIR. Notably, the EIR did not recommend adoption of any of the alternatives, but the city council nonetheless opted to approve a reduced-sized alternative instead of the 40 units proposed, showing the use of 40 units as a target did not prevent the city council from earnestly considering lower density options.

### III.

### CUMULATIVE IMPACTS

#### A. Additional Facts

##### 1. Water Supply and Demand

The EIR analyzes the water supply, drawing from the City of Santa Cruz 2015 Urban Water Management Plan (UWMP). The UWMP takes into account anticipated population growth and estimates a 20-year water supply of about 3,200 million gallons per year (MGY) in 2035. Water supply reliability is impacted by a variety of factors, including fish flow release requirements, anticipated impacts from climate change, and limited storage options. The existing system will not provide a reliable water supply during

33

prolonged droughts, but the City plans to augment the water supply through conservation, recharging of regional aquifers, or advanced treated recycled water.

The project contributes to this environmental condition because the housing units will increase demand for water. The EIR estimates the project could result in a water demand of approximately 2.0 MGY, or less than one hundredth of one percent of the total estimated future water demand within the City's service area. During average and normal years, there are adequate supplies. During periods of dry years and drought, the customers in the project's areas would be subject to curtailment and conservation measures. The EIR explains "the impact of increased water demand on water supplies due to the proposed project is considered less than significant as there are sufficient supplies from existing sources to serve the project."

In the cumulative impact discussion, the EIR states the project will not substantially exacerbate water supply reliability because it will not increase curtailment measures otherwise required in dry years. It also explains the project's required mitigation measures and payment of the System Development Charge reduces the impacts so that the incremental contribution to the water supply is not cumulatively considerable.

2. Traffic Impacts

The recirculated DEIR uses a "level of service" (LOS) measurement to describe traffic congestion and delay at intersections based on the amount of traffic each roadway can accommodate, in addition to factors like maneuverability, driver dissatisfaction, and delay. The study rated intersections on an LOS scale of "A" through "F," with A representing free-flowing conditions and F representing congested conditions. The City's General Plan 2030 seeks to maintain an LOS D or better at intersections

34

with signals, but it accepts a lower LOS at major regional intersections if necessary improvements are prohibitively costly. For state highways, Caltrans targets appropriate traffic levels between LOS C and D. If an existing highway is operating at less than the appropriate LOS target, the existing LOS should be maintained.

The City determined the project would have a significant impact on the traffic system's circulation. For intersections already operating at LOS D and F levels, the City considered the project impacts to be significant if the congestion levels at the intersections would become "measurably worse" as a result of the project. The EIR recognized that project trips would contribute to the existing unacceptable LOS at the Ocean Street/Highway 1 southbound offramp, and it considered that contribution to be a significant impact. It required the project applicant to contribute to the cost of signalization and widening the offramp to reduce congestion and improve the LOS to B. Thus, although the EIR concluded that the project would result in an increase in daily and peak hour trips, it determined the project would not cause existing or planned intersections to operate at an unacceptable LOS.

The EIR also concluded that the project's contribution to the daily and peak hour trips along the state highway segments was less than significant because it would not change the LOS to an unacceptable level.

The cumulative impact analysis for traffic and transportation considered the effect of the project in light of the General Plan 2030. The General Plan was based on estimated buildouts using a number of approved and foreseeable projects, as well as long-range growth. The buildout assumptions provided for an increase of 315 dwelling units, including in the Ocean Street neighborhood area, but the original buildout assumed a low-density residential designation.

The EIR also concluded that the cumulative traffic would result in significant cumulative impacts at several intersections. At those intersections where the LOS would continue to be unacceptable, the project's contribution would be less than 25 peak hour trips, which the EIR determined was minor because it would not result in discernible changes to delays or operations, and therefore was not cumulatively considerable.

The EIR also noted that Senate Bill No. 743, signed in September 2013, made significant changes to how transportation impacts would be assessed. It anticipated that vehicle miles traveled (VMT) would be the new metric, and it estimated information based on VMT for informational purposes. The calculated VMT fell below the state's suggested threshold of significance, so the EIR determined that even under the VMT measure, the project would not have a significant impact.

## B. Legal Principles

An EIR must discuss cumulative impacts when a project's incremental effect is cumulatively considerable. (Guidelines, § 15130, subd. (a).) Cumulative impacts occur when "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (*Id*., § 15355.) However, an EIR may conclude the project's contribution is less than cumulatively considerable if the project "is required to implement or fund its fair share of a mitigation measure or measures designed to alleviate the cumulative impact. The lead agency shall identify facts and analysis supporting its conclusion that the contribution will be rendered less than cumulatively considerable." (*Id*., § 15130, subd. (a)(3).)

The Guidelines require the discussion of cumulative impacts to reflect the severity of the impact and the likelihood of happening; however, the discussion does not need to provide as much detail as is required for effects

attributable solely to the project. (Guidelines, § 15130, subd. (b).) "The discussion should be guided by the standards of practicality and reasonableness" (*ibid*); "[a] good faith and reasonable disclosure of the cumulative impacts is sufficient" (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 906).

### C. Cumulative Impacts on Water Demand

OSENA contends the EIR draws an incorrect conclusion about the significance of the project's impacts to the water supply. We consider whether the EIR provides adequate information to decisionmakers, and we review its factual conclusions for substantial evidence. (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 392, 402; *Sierra Club*, *supra*, 6 Cal.5th at p. 515; *North Coast Rivers*, *supra*, 216 Cal.App.4th at pp. 626-627.)

In discussing the project's impact on water supply, the EIR relies on the UWMP, which evaluates the water supply within the City's system based on projected growth within the area for the next 20 years. (*Vineyard*, *supra*, 40 Cal.4th at pp. 434-435 [no requirement to "reinvent the water planning wheel" for each new land use development].) The UWMP takes into consideration population growth when it predicts water supply shortfalls by 2035. The EIR recognizes this existing problem, and it discusses citywide measures that address water supply because of anticipated shortfalls. The EIR also considers the project's contribution to the environmental condition, identifying the project as using 2.0 MGY, or less than one-hundredth of one percent of the estimated future water demand.

OSENA cites to *Kings County Farm Bureau v. City of Handford* (1990) 221 Cal.App.3d 692 (*Kings County*) and *Los Angeles Unified School District v. City of Los Angeles* (1997) 58 Cal.App.4th 1019 (*LA Unified*), characterizing the City's approach as an inappropriate ratio analysis, and it argues that the

37

EIR "improperly focused on the relatively small contribution of the [p]roject rather than the City's severe water supply shortage and the expected growth" and failed to consider the Project's impact in light of past, present and future projects and the magnitude of the City's water shortfall.[15] However, the DEIR analysis is different from the ratio theory used in *Kings County*. In *Kings County*, the project would have contributed less than one percent to the air quality condition, which the agency concluded meant it would be less than significant. (*Kings County*, at pp. 719-720.) The court disapproved of the approach, explaining that the cumulative impacts analysis must assess the collective and combined effect of the condition. (*Id.* at p. 721.) There, the EIR omitted facts relevant to the collective effect the project and other sources would have had on air quality (*ibid*), but here the EIR discusses the project's contribution to water consumption in the context of the other sources also contributing to water consumption, thereby assessing the combined effect of the water supply.

Likewise, the cumulative impacts analysis in *LA Unified* is different from the present case. There, the EIR concluded additional traffic noise from the project was not significant because the noise level already exceeded the maximum specified by health guidelines. (*LA Unified*, *supra*, 58 Cal.App.4th at pp. 1024-1025.) The court rejected the approach, concluding it trivialized the noise impact and explaining that the issue was whether the additional traffic noise should be considered significant in light of the serious existing noise problem, a question the City did not consider. (*Id.* at pp. 1025-1026.) Here, the cumulative impacts analysis considers the impact of the additional water demand in light of the city-wide needs. Although the EIR discusses the

---

15    OSENA does not identify any omitted projects that similarly serve to contribute to the water demands.

additional water demand in terms of a percentage (less than one-hundredth of one percent), it also looks at the total demand amount (2.0 MGY) and explains whether that is significant in light of current water supply conditions and future demands. It explains that because the project's consumers will not cause additional curtailment requirements and will be subject to city-wide conservation requirements, the impact is less than significant. The project's contribution is not cumulatively considerable because its contribution is already accounted for in the UWMP estimates.

Further, the project is required to mitigate water use by installing water conserving fixtures and landscaping, as well as curtailing use based on the severity of the drought, and it is required to contribute to a "System Development Charge" to pay for system improvements and conservation programs designed to help alleviate future water supply issues. Because the project implements and funds its share of measures to reduce water supply demand, the EIR concludes the project's contribution is not cumulatively considerable, as the Guidelines permit. (See Guidelines, § 15130, subd. (a)(3).) Accordingly, the EIR provides adequate information to allow for informed decisionmaking, and there is substantial evidence in the record to explain to support the City's conclusions.

### D. Cumulative Impacts on Traffic

In its opening brief, OSENA contends the analysis of cumulative impacts on traffic is inadequate because it compares the project's relative impact to the overall magnitude of the problem. It argues the City was required to consider the significance of the incremental contribution in light of the seriousness of the existing traffic problem but failed to do so.

Even assuming OSENA is correct, its arguments on this point are moot in light of recent amendments to the CEQA Guidelines. (*Citizens for Positive*

*Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 625.) After the release of the FEIR in 2018, the California Natural Resources Agency adopted revisions to the CEQA Guidelines that established criteria for analyzing the significance of traffic impacts. (Pub. Resources Code, § 21099, subd. (b)(1).) Guidelines section 15064.3 became effective July 1, 2020, and it applies prospectively (Guidelines, §§ 15064.3, subd. (c), 15007, subd. (b)). It provides that "a project's effect on automobile delay shall not constitute a significant environmental impact." (Guidelines, § 15064.3, subd. (a).) Because LOS-based traffic analysis is no longer a consideration to determine if a project's impact is significant, the City would be under no obligation to conduct a LOS-based analysis on remand. (*Citizens*, at pp. 625-626.)

Further, the Guidelines now identify vehicle miles traveled (VMT) as the proper metric for analyzing transportation impacts. (Guidelines, § 15064.3.) The EIR separately addresses the project's potential impact on traffic using the VMT metric that was proposed at the time and concludes the impact would be less than significant. OSENA does not challenge this analysis or determination on appeal.

IV.

COMPLIANCE WITH SANTA CRUZ MUNICIPAL CODE

A. Additional Facts

In October 2010, the planning commission recommended adoption of a PDP for the project, among other things. Neighbors raised concerns about mercury air emissions from dental amalgams caused by the adjacent crematorium. To explore the issue, the item was continued to the November meeting. It was continued again at the November 4, 2010 city council meeting, and it was continued indefinitely at the December 2, 2010 meeting.

40

On June 21, 2018, the project applicants held a community meeting to present and discuss the project, and the planning commission held a public hearing on August 16, 2018. The planning commission recommended approval, and the planning and community development department recommended adoption of the PDP. The city council held a public hearing about the project at its September 25, 2018 meeting.

The city council adopted Resolution No. NS-29,449 on September 25, 2018. The resolution included General Plan and Zoning amendments to redesignate the project's parcel to a multiple residence, low density zone. The resolution found the PDP would "allow for variations in off-street parking and slope regulations." It explained the PDP would support the City's Housing Element Goal 1.0. The resolution specifically found that allowing development closer than 20 feet from 30 percent slopes (at a 10-foot minimum distance) would facilitate the development of residential buildings in a cluster manner. It also found the project to be consistent with the purpose of the PDP to allow for creative and innovative design to meet the public interest and General Plan goals, in particular by allowing for development 10 feet from a 30-percent or greater slope. And it made the other findings required by Santa Cruz Municipal Code sections 24.08.720, et seq.

OSENA filed a petition for writ of mandamus, arguing the approved project violated the municipal code because the City erroneously granted a variance through the PDP process without requiring slope modifications to be granted "pursuant to procedures set forth in Chapter 24.08, Part 9 (Slope Regulations Modifications)." (See Santa Cruz Mun. Code, § 24.08.720.) The City opposed the petition, arguing the PDP did not require compliance with the slope regulations modifications.

In its tentative ruling, the trial court declined to give the City's statutory interpretation any deference, explaining the court did not find the language or context of the code ambiguous. The qualifying language "pursuant to" contained in subsection 9 persuaded the trial court that a PDP required compliance with the slope modification regulation procedures contained in Part 9 of Chapter 24 notwithstanding their inclusion among a list of areas available for variance via the PDP.

At the initial writ hearing, the court commented that the word "variation" contained in the disputed provision was a broad term, and it was unclear what it meant in the context of the ordinance: "You don't have to comply with anything? Or does it simply mean that the zoning director can say, well, you don't need to do this for slope modification . . . . I don't know."

At its final hearing on the writ, the court told the parties it found the statutory language to be clear; it found no ambiguity. It concluded the City failed to make the findings required by Santa Cruz Municipal Code section 24.08.820 and failed to follow the procedures required by Santa Cruz Municipal Code section 24.08.810; the court granted the writ of mandamus on that limited issue.

The court told the parties it did not have sufficient familiarity with the intricacies of the project or where the lots were laid out, but it appeared that no lot could be "established" that created a building site within 20 feet of a 30 percent slope unless certain procedures were followed. The court also explained that to the extent the project was redesigned so that no lot was "created which results in a building site within 20 feet of the 30-degree slope," the slope modification regulations would not come into play.

The court said it thought the parties had stipulated that the project authorized the creation of lots which permit a building site or sites within 20

42

feet of a 30 percent slope. Counsel for the City told the court there had been no stipulation to create lots; the City had a single lot that encompassed the whole project. The court responded: "So long as there is no building sited within 20 feet of a 30 percent slope, there is no violation of the zoning ordinance. And that's the intent of my ruling." It then specified that "no further action [could] be taken in furtherance of the permit, until the city ha[d] complied with the slope regulation modification provisions of the ordinance, or ha[d] removed the offending building site," and it told the parties the writ was limited to "curing the violation, which has been established that the planned development permit was issued without compliance with the slope regulation modifications, given the current configuration of the project."

The court said, "to the extent the project changes so that that [the slope regulation modification] violation no longer exists, then the writ could be returned, and whatever authorized permits could then issue." It further detailed its expectation: "[W]hat I'm directing the city to rescind is the permit itself, until there has been either compliance with the slope regulation modification or until the project itself is modified so that it no longer violates the 20 feet within 30 percent slope provisions."

The order and judgment states: "Because [the City] did not follow the procedures provided in Chapter 24.08, Part 9, . . . and because the proposed development would create a new lot that requires a house to be sited within twenty feet of a thirty-percent slope, [the City] committed a prejudicial abuse of discretion by failing to proceed in a manner required by law."

B. Relevant Municipal Code Sections

Chapter 24 of the Santa Cruz Municipal Code addresses zoning. The ordinance's purpose among other things, is to "prevent unnecessary

43

regulation or arbitrary restrictions in the exercise of private initiative of property use" and to "establish simple and readily available procedures through which private individuals or groups, the planning department, the planning commission, or the city council may initiate zoning changes as evolving community needs dictate." (Santa Cruz Mun. Code, § 24.02.020.)

Part 8 of the zoning ordinance addresses land use permits and findings. It contains the ordinances detailing the requirements for variances (Santa Cruz Mun. Code, § 24.08.100 et seq.); slope regulation modifications (*id.*, § 24.08.800 et seq.); development agreements (*id.*, § 24.08.2500); and various permits, including PDPs (*id.*, § 24.08.700).

A PDP "allows deviation from conventional zoning in a number of areas," which the code details. (*Branciforte Heights, LLC v. City of Santa Cruz* (2006) 138 Cal.App.4th 914, 920, fn.2; see Santa Cruz Mun. Code, § 24.08.720.) The PDP process is intended to allow for innovation and creativity in site planning to benefit the public and the developer. (Santa Cruz Mun. Code, § 24.08.710.) For a PDP to be granted, there must be findings that the project is consistent with the General Plan and the purpose of the PDP zoning chapter; its variations to the regulations serve the public to an equal or higher degree than the underlying district regulations; it can be coordinated with development of surrounding areas; and the project provides greater open space than would be permitted by underlying regulations. (Santa Cruz Mun. Code, § 24.08.770.) Before the permit is granted, the zoning board holds a public hearing and makes a recommendation to the city council. (Santa Cruz Mun. Code, § 24.08.760.)

The General Provisions section of the PDP part of the code states that "[a] planned development permit provides variation on district regulation, where appropriate," and it identifies 10 areas of variation, listing them:

44

"1. Building setbacks.

"2. Street standards.

"3. Lot coverage.

"4. Parking and loading.

"5. Landscaping.

"6. Open space.

"7. Lot area.

"8. Uses.

"9. Slope modifications, pursuant to procedures set forth in Chapter 24.08, Part 9 (Slope Regulations Modifications).

"10. Height, not to exceed one story or twenty percent of height (in feet) over and above regulations established in district regulations for the district in which the project is proposed." (Santa Cruz Mun. Code, § 24.08.720.)

The section concludes with the statement that "[a]ll aspects of the proposed development which represent a departure from strict application of district regulations shall be explained in the application and reasons given why the proposed development plan affords greater public benefits than would be achieved through application of conventional zoning regulations." (*Ibid.*)

C.  Standards of Review

At issue here is how to interpret paragraph 9.  OSENA contends that to comply with the PDP variance requirements, an applicant must follow the procedures found in Chapter 24.08, Part 9 for any slope modifications.  The City argues the inclusion of the slope regulation modifications provided in

Chapter 24.08, Part 9 on the list of areas for variation in a PDP means an applicant does *not* have to comply with the modification procedures provided in Part 9.

We review disputes over the interpretation of a statute or ordinance de novo. (*Audio Visual Services Group, Inc. v. Superior Court* (2015) 233 Cal.App.4th 481, 489 (*Audio Visual*).) "[W]e accord no deference to the trial court's ruling on this issue." (*Save Our Heritage Organisation v. City of San Diego* (2015) 237 Cal.App.4th 163, 174.) When interpreting an ordinance, we apply the same rules of interpretation applicable to statutes. (*Ibid.*) Thus, we first examine the language of the ordinance, giving the words their usual and ordinary meaning, in the context of the ordinance as a whole and its purpose. (*Audio Visual*, at p. 489.) In addition, we "apply common sense to the language at hand" and interpret a provision in a manner that makes "it workable and reasonable" and avoids an absurd result. (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1122.)

"Whether judicial deference to an agency's interpretation is appropriate and, if so, its extent—the 'weight' it should be given—is . . . fundamentally *situational*." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12.) The interpretation of an ordinance or other legislation by its enacting body "is of very persuasive significance." (*City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1021.) "Deference is particularly appropriate where, as here, the agency is interpreting its own language, drafted to suit a particular circumstance, rather than the language drafted by the Legislature." (*Bello v. ABA Energy Corp.* (2004) 121 Cal.App.4th 301, 318 (*Bello*).)

Although we consider the plain language of the statute, we consider it in context and with reference to its purpose. (*Audio Visual*, *supra*, 233

Cal.App.4th at p. 489; *Woodland Park Management, LLC v. City of East Palo Alto Rent Stabilization Bd.* (2010) 181 Cal.App.4th 915, 923 (*Woodland*) [courts can determine if literal meaning of statute comports with its purpose].) Moreover, we recognize that sometimes the meaning of a statute is not properly determined from a word or phrase in a sentence; a literal construction should not prevail when it is contrary to the statute's intent. (*Woodland*, at p. 923.)

### D. The City Did Not Violate its Municipal Code

1. The City Complied with the PDP Requirements.

The City argues the trial court improperly declined to give deference to the City's interpretation of its municipal code and focused on the words "pursuant to" without regard to the context of their use. We agree. OSENA argued below, as it does here, that the inclusion of the words "pursuant to" following "Slope regulation modifications" means, unambiguously, that the project developer must comply with the provisions of Chapter 24.08, Part 9. The trial court agreed; its tentative ruling stated it did not find the language or context of the code ambiguous, and so it was not giving the City's interpretation deference. But the court acknowledged during the hearing that the General Provisions subsection's reference to "variations" was broad, and it also told the City the language in the ordinance "created confusion."

When we read subdivision 9 in the context of the remaining items on the list and with the purpose of the PDP section in mind, we reach a different conclusion: The City's interpretation is consistent with the ordinance text. The General Provision section explains that it provides a "variation" and a "departure" from the listed regulations. (Santa Cruz Mun. Code, § 24.08.720.) In other words, it provides a variation to the slope regulations

47

modification procedures identified in subdivision 9 because project applicants already have to follow the slope modification procedures.

Under OSENA's interpretation of the language, a project applicant would need to apply for a PDP and, as part of that application process, also separately apply for a slope modification following the requirements of section 24.08.720. Under that interpretation, subdivision 9 creates a redundancy and serves no readily apparent purpose. (See *Woodland*, *supra*, 181 Cal.App.4th at p. 926 [rejecting ordinance interpretation that serves no apparent purpose].) Had the City intended PDP applicants to comply with the slope modification requirements, it would have achieved that result simply by omitting slope modifications as an area of variation available through the PDP process.

The difference in wording of the slope modification procedures as compared to the preceding areas on the list which concerned the court is easily explained. Other than subdivision 9, none of the areas listed for variation via the PDP has a separate Part in the code devoted to a modification procedure, which distinguishes slope modifications from other types of variations.[16] Additionally, the other areas identified in the General Provisions section for variances via the PDP have regulations scattered throughout the code. (See, e.g., Santa Cruz Mun. Code, §§ 24.10.110 [height limits]; 24.10.130 [yard or open space limitations]; 24.10.450 [open space

---

[16] Portions of the Santa Cruz Municipal Code address building setbacks or parking variations explicitly. However, they are unlike the slope regulation modifications because they do not just detail procedures for seeking modifications; they detail the specific modifications and variances available. (See Santa Cruz Mun. Code, §§ 24.12.110, 24.12.290.)

regulations for multiple residence - low density]; 24.10.585 [open space for high density multiple residences]; 24.08.440 [substandard residential lot coverage]; 24.16.140 [lot coverage for accessory dwelling units].)

OSENA's argument that a procedure for simultaneously seeking a PDP and a slope modification permit is anticipated in Santa Cruz Municipal Code section 24.08.810 is unpersuasive. Santa Cruz Municipal Code section 24.08.820 includes a provision that precludes granting a permit for a slope modification without a hearing if it is accompanied by an application that must be heard by a higher body. OSENA contends a PDP is just such an application, but it offers no evidence to support this claim. And the claim ignores that there are other situations to which the language applies, including requests for other types of permits or zoning map amendments, which require public hearings. (See Santa Cruz Mun. Code, §§ 24.04.130 [detailing permits and actions requiring public hearings]; 24.08.030 [administrative use permit]; 24.08.240 [special use permit]; 24.08.920 [historic alteration permit].)

Moreover, OSENA's contention that the City's interpretation is somehow faulty because the DEIR explicitly acknowledges in one location that conventional slope regulations apply lacks merit because the FEIR corrects that statement, and other statements in the EIR make clear a PDP provides a variation from the conventional slope regulations.

Unlike the trial court, we offer deference to the City here. Doing so is appropriate because we are evaluating a code section the City itself

49

developed.[17]  (See *Bello*, *supra*, 121 Cal.App.4th at p. 319.)  Assuming it is reasonable to treat the words "pursuant to" in subdivision 9 as requiring compliance with Part 9, the slope modification regulations procedures, we would nonetheless defer to the City's interpretation here because it is equally reasonable to treat "pursuant to," a phrase that follows a comma, as introducing a descriptor rather than a mandate, i.e., the area of variation is the slope regulation modifications, which have detailed procedures in Part 9 of Chapter 24.08.  (See *Craik*, at p. 891 [deferring to county's construction of its own ordinance where equally reasonable views reach differing conclusions]; *Bello*, at p. 319.)  Further, the City's interpretation is consistent with the legislative intent of the PDP to allow creative and innovative design to meet the public interests more readily than through application of the conventional zoning regulations, which are more cumbersome.  (See Santa Cruz Mun. Code, § 24.08.700.)  Accordingly, we conclude the City did not

---

[17]  OSENA contends the City's interpretation of its own ordinance is undeserving of deference because the interpretation was not formulated contemporaneously with the adoption of the regulation.  However, this consideration is more appropriate when evaluating an agency's interpretation of a statute drafted by a different body.  (See *Eskeland v. City of Del Mar* (2014) 224 Cal.App.4th 936, 946; see also *Craik v. County of Santa Cruz* (2000) 81 Cal.App.4th 880, 891 (*Craik*).)

50

violate the municipal code by granting a slope modification as part of the PDP.[18]

### 2. The Project Does Not Create New Lots.

OSENA contends the project also violates Santa Cruz Municipal Code section 24.14.030, subdivision (1)(h), a subdivision of the code's slope regulations. Under that provision, "[n]o new lot shall be created which will require the house to be sited within twenty feet of a thirty-percent slope." (Santa Cruz Mun. Code, § 24.14.030, subd. (1)(h).) OSENA argues that because the project creates a "new lot," the City is prohibited from building within 20 feet of a 30 percent slope.[19] However, the City explains that the project does not create new lots; thus, this provision does not apply.

The Santa Cruz Municipal Code defines a "lot" as a "piece or parcel of land, occupied or intended to be occupied, or capable of being occupied, by a permitted principal building or a group of such buildings . . . ." (Santa Cruz Mun. Code, § 24.22.494.) The project has been designed on an already-existing lot of land, one that is intended to be occupied by a permitted group of buildings. There is no evidence in the record that the City has requested to

---

18 Although not necessary to our conclusion regarding the meaning of subdivision 9 in section 24.08.720, we note that the City addressed slope stability and other potential concerns via geotechnical analyses and testing by geotechnical engineers, as well as through studies and testing by civil engineers and soils experts, as required by other provisions in the code. (See Santa Cruz Mun. Code, §§ 24.14.060 [erosion hazards]; 24.14.070 [seismic hazards]; 18.45.010 et seq. [excavation and grading regulations].) The reports indicate that the project design will improve slope stability.

19 Santa Cruz Municipal Code section 24.14.030 contemplates slopes on existing lots. Buildings can be added to existing lots within 20 feet of a 30 to 50 percent slope if an exception or variance is granted. (Santa Cruz Mun. Code, § 24.14.030, subd. (1)(d).)

divide the existing lot into smaller lots to build upon.  OSENA more or less concedes this by explaining that the City here approved "a tentative map and condominium plan that place residential buildings on a single lot" and then by arguing the City "essentially" created a lot placing residential buildings on it, because it contends approval of a tract map and a condominium plan creates a lot.  But OSENA does not explain why that must be so under these circumstances.  The project applicant sought approval of a tentative map for potential future sales of condominium units (see Santa Cruz Mun. Code, § 23.16.050), but that approval did not alter the fact that the project was building 32 units on a single lot of land.  Accordingly, Santa Cruz Municipal Code section 24.14.030, subdivision (1)(h) does not apply.

OSENA also argues the City failed to make this argument before the trial court.  However, when the court commented it believed the parties had stipulated that the project authorized the creation of lots, the City contradicted the court's statement and clarified there was a single lot; it was not creating new lots.

The court seemed unconcerned about the distinction, explaining its intent was to prohibit a building within 20 feet of a 30 percent slope until the City complied with the slope modification provisions.  Although the judgment states the City committed a prejudicial abuse of discretion in part because the project would create a new lot with a house sited within 20 feet of a 30 percent slope, the court's admission that it did not have sufficient familiarity with the intricacies of the project or where lots were laid out belies any claim the court expressly found the project was creating new lots for the multi-unit buildings.

Instead, the court focused on the slope regulation modification requirements found in subdivision (1)(d):  "[W]hat I'm directing the city to

rescind is the permit itself, until there has been either compliance with the slope regulation modification or until the project itself is modified so that it no longer violates the 20 feet within 30 percent slope provisions." In other words, the court was concerned about compliance with the slope modification regulation procedures.

3. Building Setbacks and Slope Regulations are Handled Separately.

Finally, the City contends that because the PDP allows variances to building setbacks, it can permit building within 20 feet of a 30 percent slope, as slope regulations are a type of building setback. We need not reach this issue, having already determined that the City properly sought a variance for slope modifications via the PDP process. However, were we to consider this issue on the merits, we would conclude the trial court appropriately concluded setbacks and slope regulations are separately regulated.

We recognize that the slope regulations create a type of setback in the conventional sense, because they prohibit building within a certain distance from a slope. (See Santa Cruz Mun. Code, § 24.14.030.) However, the municipal code addresses setbacks separately from slope regulations. Not only is this apparent in the General Provisions of the PDP (*id.*, § 24.08.410), where they are separately referenced, and in section 24.14.030, which provides slope regulations but does not mention setbacks, but it also apparent throughout the code. The District Regulations, which define the setback requirements for various types of dwelling units, identify the minimum setbacks for front yard space, rear space, and side yard space, as well as the minimum distance between buildings and the requirements for attached garages or carports. (*Id.*, §§ 24.10.585, subd. (2) [high density districts]; 24.10.608, subd. (2) [medium density districts]; 24.10.616, subd. (2) [motel residential districts]; 24.10.632, subds. (1), (2) & (3)(b)(1) [beach

53

residential]; 24.10.640, subds. (1), (2) [beach medium/high density residential].) But there is no mention of setbacks from slopes.[20] (*Ibid.*)

## DISPOSITION

We reverse the order and judgment granting the limited writ of mandamus and remand the matter to the superior court with instructions to vacate that portion of the judgment that commands the City to set aside approval of the Planned Development Permit pursuant to Resolution No. NS-29,949 for the 1930 Ocean Street Extension Residential Project as it pertains to variations from slope regulations, as approved by the City Council of the City of Santa Cruz on September 25, 2018. We further direct the trial

---

[20] Slopes are also mentioned in section 24.08.450 in the design subdivision addressing grading for large homes in single family areas, not in the subdivision addressing setbacks. (Santa Cruz Mun. Code, § 24.08.450, subds. (4)(d) & (f)(1).)

court to strike the related injunctive relief.  In all other respects the judgment is affirmed.[21]  Parties to bear their own costs.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.

---

[21]    The court entered judgment in favor of OSENA.  The judgment also granted OSENA permission to file a Memorandum of Costs (Cal. Rules of Court, rule 3.1700) and to request an award of attorney fees as the prevailing party (Cal. Rules of Court, rule 3.1702).  We leave this issue for the parties and the court to address on remand in a manner consistent with this opinion.

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| OCEAN STREET EXTENSION NEIGHBORHOOD ASSOCIATION,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF SANTA CRUZ et al.,<br><br>    Defendants and Appellants;<br><br>RICHARD MOE et al.,<br><br>    Real Parties in Interest and Appellants. | D079064<br><br><br>(Super. Ct. No. 18CV03212)<br><br><br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed December 16, 2021, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.


HUFFMAN, Acting P. J.

Copies to:  All parties

2